for the second and final day of our sitting this week. So welcome everybody. I do want to say before we call the first case, I just want to recognize our, our intrepid law clerks. They are the bright, but haggard and tired looking people behind you. For many of them, today's their final court session before wrapping up a year of pretty remarkable service. So these are great Americans who have served this court and by extension, the nation and the rule of law with brilliance and integrity and devotion. And we're deeply grateful for their extraordinary service and I'm pretty hyped about their new adventures ahead. And at this point, a bald eagle was supposed to swoop into the courtroom, but a mystics queue. Okay. But thank you to them. And we're ready if you are. So we're going to call the first case 2410633 U.S. v. Wilson. Ms. Ito? Ito. Ito, welcome. Take it away. May it please the court. My name is Louie Ito and I represent Jemaine Wilson, the appellant. With the court's permission, I'll start with the constitutional issue. Section 922-0 is a sweeping prohibition on the mere possession of a bearable arm protected by the Second Amendment. Under Bruin's new framework, it is presumptively unconstitutional and the government has not carried its burden to demonstrate that it falls within this nation's historical tradition of firearm regulation. I'll break that down into three main points. First, Bruin established a new historical paradigm for evaluating Second Amendment claims. Because this court has not analyzed this statute under the Bruin framework, it must conduct that analysis. This court is not bound by Hollis v. Lynch because that decision applied the wrong framework to a set of facts that are obsolete today. Under Bruin's Step 1, the statute is presumptively unconstitutional because the plain text of the amendment covers the conduct prohibited by the statute. And I want to point out here that under Diaz, the dangerous and unusual inquiry draws upon history and tradition, so it is the government's burden under Step 2. Diaz quoted Justice Barrett's Cantor v. Barr dissent, which recognized that there are two ways to use history and tradition. One, to identify the scope of the right, or two, to identify the scope of the government's power to take it away. And Diaz said that under Bruin, it has to be the latter. So if the government wishes to rely on a purported history and tradition prohibiting the carrying of dangerous and unusual weapons, it must prove that under Step 2. Which brings me to my third point. The government has not established that such a historical tradition exists, nor that it applies to machine guns today. None of the government's historical evidence serves as an analog to this law, which prohibits mere possession. The government, in their own words, used armed laws as an analog because those laws prohibited the bearing of arms to terrorize people, as opposed to merely possessing them or carrying them in public. The government also cited an East Jersey law that Bruin also discussed at length, pointing out that it criminalized concealed carry and rejecting it as an analog. With no founding era analogs, the court should not rely solely on the government's proposed analogs concerning certain types of knives and daggers. From the mid to late 19th century, Bruin warned that we should not give post-enactment history more weight than it can rightly bear. Those laws, ranging from 1837 to 1893, are 50 plus years after the founding, and just looking at some of them, some impose fines, some prohibit certain conduct, such as committing crimes while possessing the weapons in question. The government has not established a historical tradition prohibiting the mere possession of so-called dangerous and unusual weapons. Even if this court accepts that the government has established such a history and tradition, the government has still not shown that this law is consistent with that historical tradition. We have consistently asserted a number of 740,000 plus registered machine guns, according to ATF. The district court credited this number below. Adding unregistered arms, such as the number of unregistered machine guns. I know there's language in Heller saying that the Second Amendment protects weapons possessed by law-abiding citizens for lawful purposes, but the correct reading of that phrase is that the Second Amendment protects the sorts of weapons that citizens possessed for self-defense at the founding and would bring with them for militia service. Keeping in mind that Heller said that the Second Amendment applies to bearable arms non-existence in the founding, that principle extends to Glock switches today because they are widely available and easy to replicate. We mentioned the number 1 million, so just to put that in context, experts estimate the number of people who have Parkinson's disease is about 1 million. According to the Department of Housing and Urban Development, 771,000 people experience homelessness, but we would not say in normal conversation that the number of people who suffer from Parkinson's are unusual or that homeless people are unusual. So given that there are likely over 1 million of these arms on the streets in circulation, it defies reason to say that they are unusual. You haven't mentioned Hollis yet. I'm sorry, Your Honor? You haven't mentioned Hollis. Oh, I'd be happy to address Hollis. So there are four reasons why this Court should not rely on Hollis. Number 1, this Court made very clear in Diaz that Bruin constitutes an intervening change of law that renders the prior precedent obsolete, and so because this Court did not apply the Bruin framework to 922-0, Hollis is in effect obsolete, just as this Court's precedent on 922-G1 was believed to be in Diaz. Also, Bruin— Where does your Bruin argument appear in your brief, that Hollis has been either implicitly or explicitly overruled? I didn't see it. Did I overlook it? We did. In our brief, we argued using the Bruin framework, the Bruin two-step framework. That's how we framed our argument, and we also mentioned the fact that the District Court denied the as-applied challenge by considering the conduct during the offense. That District Court decision was rendered prior to this Court's decision in Diaz, and we pointed out that under Diaz, the Court made very clear that the facts remain to the as-applied challenge are limited to those facts that go to why the person's being dispossessed of the firearm. In Diaz, the Court did not look to the fact that the person was committing a drug trafficking offense while he was possessing the firearm in question. The Court looked to the fact that he's being dispossessed because of his prior felony convictions, so it limited its analysis on the as-applied challenge to the predicate felony. We did point out that Bruin applies, Diaz applies. That's why the District Court's analysis was wrong. Okay. Finish your other Hollis points. Yes. Back to Judge Ho's question about Hollis v. Lynch. Applying the Bruin analysis, if we satisfy Step 1 and we believe the conduct is covered by the plain text of the statute, the presumption is that the statute is unconstitutional. So Hollis didn't apply that presumption. Hollis also incorrectly put the dangerous and unusual analysis under what that means on scrutiny Step 1, but as I've explained earlier, Diaz makes clear that under Bruin, the dangerous and unusual analysis, because it draws upon history and tradition, it properly belongs under Step 2. Because it belongs under Step 2, it is the government's burden to prove that the regulation is consistent with this nation's historical tradition of firearms regulation. Hollis also relied on Supreme Court dicta and Heller suggesting that laws banning machine guns are constitutional. In Diaz, the government invited this court to rely on similar dicta from Heller, Bruin, and Rahimi that laws disarming felons are presumptively lawful. And I understand other circuits did that. They relied on that categorical bans on felons from possessing firearms. Assuming you didn't waive your argument that Bruin abrogated Hollis, the principal argument to me that you're making seems to be that Hollis isn't binding because the data on which it relied is outdated. But the only exception to the rule of orderliness is intervening Supreme Court precedent. Again, we're putting Bruin aside. Or precedent from our court sitting on bonk. So what is the authority for this proposition that the rule of orderliness doesn't apply when facts on the ground change, when the data is different? Your Honor, Bruin recognizes that our understanding of the Second Amendment and what's protected must evolve in relation to societal and technological changes. I believe Bruin recognized the point that if you transport yourself back in time, the founding handguns would be regarded as dangerous and unusual, but they're not today at the time that Heller and Bruin were decided. And Bruin recognized that just as the First Amendment applies to electronic communications that did not exist at the time of the founding, the Fourth Amendment applies to cell phones, to GPS devices. Our understanding of what's protected by the Second Amendment... Respectfully, I don't know that you're answering Judge Willow's question. Because that sounds like you're talking about the substantive analysis of a constitutional provision. I think Judge Willow is asking a stare decisis question. Yes, Your Honor. He was asking what's my intervening change of law. Is that correct, Judge Willow? Yeah. Judge Ho is... Yes. So I guess... So our position is that we didn't waive the Bruin argument, but assuming we did, I would say that there isn't an intervening change of law, but there is a dramatic change in the real world facts and in other... Do you have any example where we are allowed to ignore an otherwise binding precedent based on scientific or other practical changes in the world? Imagine we applied this to a public court, to abortion. The science of abortion has changed in some particular way. Can we now ignore Roe before Dobbs, or can we now ignore Dobbs in light of Dobbs? Science has totally changed since whatever relevant abortion precedent. I can't think of an example off the top of my head. I would be happy to submit briefing after this if it would be helpful to the court. But I guess I would still rest on my broader point, that even in the absence of an intervening change in law, I think that the court has understood the Second Amendment, our understanding of the Second Amendment to evolve based on changes in technology, and the court has done so in other contexts. Bruin looked to changes in how we've understood the First Amendment or the Fourth Amendment, and I believe... Again, that's about the substance of a cognitive analysis. I'm talking about stare decisis. In other words, our court in Hollis made the technological call. It's done the analysis. The question is, are we bound by it? I would say this court is not because of this dramatic change. I can't cite to a case right now that says precisely that, but I would say that that principle was alluded to in Bruin, and it's definitely true in other areas of the law, and the Second Amendment is not a second-class right. The fourth reason I was going to give is that Hollis considered a number... They considered the number of 175,000 machine guns. We believe that number is about ten times that today over a million, and so in light of... But does that include machine guns registered to government entities? If you're looking at the number of machine guns that are in common use, why wouldn't we only care about or look to the number of machine guns in private, therefore common use and not those in government hands? May I answer your first question, which is whether that number includes government entities? In our response to the government's 20-H-A letter, we cited a source that explained that the 700, and I think it's now 782,000 number, does not include those machine guns registered to federal government entities. That, I believe, excludes the military, and so ostensibly, although the ATF source doesn't say explicitly, it could include machine guns registered to state and local police. I would say that that number is still relevant because state and local police possess... If they possess machine guns, they possess them for the purpose of self-defense, and so that number, it's in common use for people to use for self-defense. It lends weight to the argument that it is an arm that a citizen would want to possess for self-defense. I want to address... Well, Ms. Ito, your red light is on, and the trap door is about to open. I will see you back on rebuttal in a few minutes, and we're going to hear now from Counsel for the United States, Ms. Pryor. May it please the Court, Lindsay Pryor for the United States. I'll start with the Second Amendment and then answer any questions that the Court has on the guideline issue, unless the Court prefers otherwise. This is a straightforward issue before the Court here today because Mr. Wilson is raising only a facial challenge to 922-0, which means he has to show that the statute is unconstitutional in every application. He can't make that showing. That's because nothing in Bruin or Rahimi has changed this Court's clear precedent that machine guns are not protected by the Second Amendment. Going back to Heller, Heller held that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes. Instead, it protects those weapons that are in common use at the time. Importantly, Heller confirmed that that limitation on the right accords with history. It said, the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right. Then it said again, the Second Amendment protects weapons in common use at the time. We think that limitation is fairly supported by historical tradition prohibiting the carrying of dangerous and unusual weapons. Then in Hollis, this Court applied Heller and determined that machine guns are not in common use by law-abiding citizens for lawful purposes because they're dangerous and unusual. It looked at the broad consensus among courts, including the Supreme Court, that machine guns are extremely dangerous and fall outside of the categories of weapons that have been traditionally widely accepted as lawful possessions. Then it looked at the fact that machine guns are unusual under a number of metrics. And the only question is whether anything in Bruin has overruled this Court's holding that machine guns are dangerous and unusual, and it didn't. That is still good law. Mr. Wilson's only argument is based on purported, updated statistics on how many machine guns are in existence, but that doesn't change this Court's prior finding in Hollis for a few reasons. In R-28J, we directed the Court to ATF's latest estimates on the number of machine guns transferable to private citizens, and that is the relevant number. And that number is essentially the same as the one the Court addressed in Hollis, which was 175,000. Now the number is slightly higher. My understanding is that that is based on ATF's ability to have better data by ATF now. So Mr. Wilson's figure that he noted does account for the number held by government entities. But the Court didn't just myopically focus on the numbers of machine guns in Hollis. It also looked at how state legislatures have responded to them, and that is with widespread restrictions or prohibitions. And nothing has changed in the common use analysis on that point. Machine guns are prohibited or restricted in most states. They remain well adapted to unlawful uses, as Mr. Wilson's conduct in this case shows, where he took a fully automatic handgun and used it to murder someone. And they are poorly adapted to the lawful purposes that the Supreme Court has identified, like self-defense, hunting, and target shooting. So all of those factors show that these are not in common use for lawful purposes. Machine guns remain dangerous and unusual and still fall outside of the scope. Assuming that we are permitted to consider the new numbers of machine gun ownership in revisiting Hollis, do you think those new numbers would change the Hollis analysis at all? Would the outcome in Hollis be different if we were able to accept the new, much larger number rather than 175,000? I don't, Your Honor. Because, again, it's not just about—Hollis didn't look to just the number of machine guns, which of course are quite small both in raw total and in proportion to the number of other firearms. But whether a weapon is unusual is not just about—is basically another way of asking is it in common use for lawful purposes? And the fact that machine gun conversion devices like Mr. Wilson had in this case, or MCDs, have proliferated in part because they can be 3D printed and violent criminals like Mr. Wilson can easily get his hands on one, don't show that they are now typically the type of weapon that is typically possessed by law-abiding citizens for lawful purposes. As defense counsel noted in her response to the 28-J letter, these are a massive law enforcement priority because they are widely associated with criminality. She cites a memo that says MCDs are, quote, perilous for law enforcement officers. They have been linked to an increasing number of notorious homicides, including a law enforcement-involved shooting in Houston, Texas, where an officer was killed during a narcotics arrest and several other examples. So whether a weapon is unusual is not just about how common it is. It's about whether it's in common use for lawful purposes to be protected by the law. Do you think Mr. Wilson's waived his Bruin abrogation argument? I—he certainly did not make that argument in his—he certainly didn't make that argument in his brief. So, yes, I would consider that he waived it, but we presented our argument as if he doesn't, and then the court does not consider how Bruin has affected the incident. Can we shift gears and talk a little bit about the cross-reference? Absolutely. To the second-degree murder finding. So the PSR, in the PSR, there are descriptions of the conduct as a crime of passion, as a sudden, strong impulse, which to some people would be more akin to voluntary manslaughter, which, you know, people talk about that in terms of a sudden quarrel or heat of passion type moment. How much time did pass between the time when Mr. Wilson discovered the fake firearm to when he shot DJ? From my recollection of the video, Your Honor, it is about a minute and a half. I think that if you look at the sequence of events, it's clear that this was not a voluntary manslaughter for a couple of reasons. Voluntary manslaughter—first, the PSR, I understand—I recognize that that language is somewhat suggestive of the voluntary manslaughter statute, but it's not the same. Voluntary manslaughter, under the federal statute, is an unlawful killing without malice because it's after a sudden quarrel or in the heat of passion. So the language crime of passion is somewhat suggestive of that, but it's not the same. Then this Court's case law is clear that a heat of passion killing is not just in response to any provocation. It's in response to an extreme mental or emotional disturbance that would provoke an ordinary person to kill. So I understand you're asking about the amount of time. I would first say there was not an adequate provocation here, but then the video shows that there is clearly time to cool for Mr. Wilson because the key indicator is whether there's time to reflect on the outcomes of one's course of action, and you can see he discovers that it's a fake. He goes to his car, loads up his unloaded machine gun pistol with a 31-round magazine, and then has to walk all the way around the Valero to confront the victim. As he approaches, you can see him holding his firearm to his chest as if he's attempting to conceal it, and then he holds it up, points it, and shoots it. So the facts show that this was clearly a murder and not a manslaughter. This Court's case law shows that both in the type of provocation and in the time that he had to cool, the facts would not show voluntary manslaughter. And then I don't think that otherwise the Court's clear finding that this was murder isn't converted into a finding that it was voluntary manslaughter, just because there's somewhat ambiguous language in a couple of sentences in the PSR, because every other point in context points to the fact that this was murder. Your Honor, the post-1986, which was when 922-0 was enacted, the number of legal machine guns transferable to private citizens has not changed, so that number remains fixed in time. So that is the relevant number that remains essentially the relevant number of machine guns for purposes of whether a weapon is unusual. Back to the murder cross-reference, I'll just reiterate that even if there is some ambiguous language in the PSR, it's not clear or obvious that that's what the PSR, that PSR made any sort of finding that there was a manslaughter. So it's certainly not clear or obvious that that's what the district court found. He hasn't cited any cases on that point. And as we argue in our brief, his argument fails on the third and fourth prongs of plain error review as well. So the Court can easily affirm the guideline point. Anything else? The Court has no further questions. We will ask the Court to affirm. Okay. Ms. Pryor, thank you very much. Ms. Ito, you're back for five minutes of rebuttal. Your Honor, I'd just like to respond to a few points made by the government. First, we have raised both a facial and an as-applied challenge. The government says we waived the as-applied challenge, but if the Court looks to page 20 of our brief, heading number 2, I believe we very clearly state that we are also raising an as-applied challenge. The Court should not use the 200,000 number cited by the government. There's a sort of circularity problem, if you will. If the Court credits that number, which is, I believe the Congress's intent was to freeze, by passing that law banning machine guns, they wanted to freeze the number of machine gun possession at what it was in 1986. So for the Court to look at that number 40 years later and say, oh, it's what it was in 1986, that is a reason to allow the government to continue banning machine guns, would in effect be blessing that policy choice. Bruin says that policy choices are off the table. The same problem with counting jurisdictions where machine guns are legal, which is one of the things that the Court did in Hollis. Again, that would in effect be allowing the contours of the Second Amendment to be shaped by the legislative judgments of those state governments. I think a better way to read the language about how the Second Amendment protects the right of law-abiding citizens is how Justice Alito suggests reading it in his Bruin concurrence. He pointed to the fact that the dissent in that case pointed to the increase in gun violence, the large numbers of handguns, and Justice Alito actually pointed to the number of illegal handguns used by the New York police, keeping in mind at the time before Bruin, most of the people in New York who possessed handguns on the street were criminals. He pointed to that number and he said that is a reason why a law-abiding person needs to have a right to a handgun, because the criminals are armed and undeterred regardless of the state of the law in New York. And he even pointed to the example of a law-abiding citizen who is determined to violate the law and possess a handgun because that person felt that they needed it for self-defense. So for that reason, Your Honor, just as Justice Alito counted illegal handguns in New York, this Court should consider the number of unregistered machine guns, which includes clock switches. I would also— Let me go back to our discussion about whether Bruin disrupts Hollis. Did Bruin affect both steps of the two-step framework or just the second step? I would say both, Your Honor, because while Bruin says that step one of what was means on scrutiny is broadly consistent with step one of Bruin, Bruin still attaches the presumption of unconstitutionality once step one is satisfied. I don't believe that was the case in means on scrutiny. So I do believe it affects both steps. Would you agree that Hollis was based only on the first step? Yes, with the caveat that Hollis also put dangerous and unusual under step one and did not correctly assign the burden of proof to the government on that. I also want to point out the same website that the government relied on for their 200,000 number also cites the much higher number of 782,000 machine guns, registered machine guns, and they have not explained the 500,000 discrepancy. Turning to the guidelines issue, the government tries to downplay the District Court's factual finding. We believe it is a very clear factual finding. The District Court used the words crime of passion. And just to be sure, this wasn't a mistake because it confirmed that by saying the defendant acted because of a, quote, sudden strong impulse. So we know it's not a mistake. It wasn't ambiguous. The District Court said it twice. And the error is clear because we've cited case law, Browner, Collins. These cases say that when there's an intentional killing, but it was crime of passion, that negates the element of malice and the crime is voluntary manslaughter rather than murder. So we believe that error is clear and obvious under this court's case law. In addition, we believe that prong three is satisfied because the disclaimer appears only in the statement of reasons and it contradicts what happened at live sentencing where the court at least three or four times expressed reliance on the guideline range, did not cite any other specific 3553A factors to justify. And I'm not aware of a published case by this court where the disclaimer appeared only in the statement of reasons and the court didn't also say something at sentencing justifying the missing. Okay, Miss Ito, thank you very much. We appreciate the arguments of counsel and the case is submitted.